**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| TEXAS BLOCKCHAIN COUNCIL, a nonprofit association; RIOT PLATFORMS, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF ENERGY; JENNIFER M. GRANHOLM, in her official capacity as Secretary of Energy; ENERGY INFORMATION ADMINISTRATION; JOSEPH DECAROLIS, in his official capacity as Administrator of Energy Information Administration; OFFICE OF MANAGEMENT AND BUDGET; SHALANDA YOUNG, in her official capacity as Director of Office of Management and Budget, <br><br> *Defendants*. | **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Case No. 6:24-cv-99 |

**VERIFIED COMPLAINT**

**Nature of the Case**

Plaintiffs Texas Blockchain Council ("TBC") and Riot Platforms, Inc. ("Riot") bring this civil action for declaratory and injunctive relief to halt an unlawful so-called emergency collection of information from many of TBC's members—including Riot. Defendant Department of Energy ("DOE") and Defendant Energy Information Administration ("EIA") proposed to perform the collection, which was unlawfully approved by Defendant Office of Management and Budget ("OMB"). In support, TBC and Riot allege as follows:

1.      This is a case about sloppy government process, contrived and self-inflicted urgency, and invasive government data collection.

2.      On January 24, 2024, Defendant EIA requested "emergency" review and clearance from OMB of a planned collection of proprietary energy information from companies that are engaged in cryptocurrency mining. This request was based on Defendant DeCarolis' ostensible determination that if such a collection were not authorized, and if the Paperwork Reduction Act's standard clearance processes were followed, then it was reasonably likely that public harm would occur.

3.      OMB approved the request two days after receiving it from EIA. But in doing so, both EIA and OMB violated the Paperwork Reduction Act and its implementing regulations. They also acted arbitrarily and capriciously in violation of the Administrative Procedure Act.

4.      Despite these failures, EIA has moved forward with its information collection and is demanding—under the explicit threat of criminal fines and civil penalties—that certain companies, including Riot and many other TBC members, reply to the survey no later than February 23, 2024.

5.      Absent this Court's intervention, Plaintiffs, TBC's members, and other mining companies who have received and are bound to complete the legally defective survey will be immediately and irreparably harmed by being forced to divulge confidential, sensitive, and proprietary information to EIA, which had no lawful authority to request or collect.

## PARTIES

6.      Plaintiff Texas Blockchain Council is a Texas non-profit 501(c)(6) trade association with its principal place of business at 1900 Jay Ell Drive, Richardson, Texas.

7.    TBC is a nonprofit industry association that works to make the State of Texas the jurisdiction of choice for cryptocurrency, blockchain, and digital asset innovation. Its efforts are focused on advocating for blockchain-centric public policy initiatives, and it is committed to being the leading professional association and networking venue for the cryptocurrency mining industry. Its members include individuals and companies interested or engaged in digital asset and blockchain technology, including cryptocurrency mining.

8.    Plaintiff, Riot Platforms, Inc., is a Nevada corporation headquartered in Castle Rock, Colorado. Riot is a Bitcoin mining and digital infrastructure company with bitcoin mining operations at a data center facility located in Rockdale, Texas (Milam County), which is owned and operated by Riot's subsidiary, Whinstone US, Inc., a Delaware corporation ("Whinstone"), which did not receive the Survey. Riot and its subsidiary, Whinstone, employ approximately 268 people at its Rockdale facility. It is a member of Plaintiff TBC. Shares of Riot common stock trade publicly on the Nasdaq Capital Market, under the ticker symbol "RIOT".

9.    Defendant Department of Energy is a department within the Executive Branch of the United States Government and an "agency" under 5 U.S.C. § 551(1).

10.    Defendant Jennifer M. Granholm is named in her official capacity as the Secretary of Energy.

11.    Defendant U.S. Energy Information Administration is a subagency within DOE and an "agency" under 5 U.S.C. § 551(1). It has independent authority to obtain data and information collection approvals. 42 U.S.C. § 7135(d). It obtained emergency approval for and is administering the Cryptocurrency Mining Facilities Report (EIA-862) Survey (the "Survey"). On information and belief, the EIA has already begun collecting data via EIA-862.

12.     Defendant Joseph DeCarolis is named in his official capacity as the Administrator of the EIA.

13.     Defendant Office of Management and Budget is an office within the Executive Office of the President of the United States and an "agency" under 5 U.S.C. § 551(1). OMB approved the emergency request for and authorized the Survey.

14.     Defendant Shalanda Young is named in her official capacity as the Director of OMB.

## JURISDICTION

15.     This Court has jurisdiction under 5 U.S.C. §§ 702-703, 42 U.S.C. § 7192, and 28 U.S.C. §§ 1331, 2201(a).

## VENUE

16.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred or are set to occur in this district. The Survey seeks information from and pertaining to Riot's operations at the facility owned and operated by its subsidiary, Whinstone, which is located in Rockdale, Texas (the "Whinstone Facility").

## STATUTORY AND REGULATORY BACKGROUND

### The Federal Energy Administration Act of 1974 (Pub. L. No. 93-275, as amended)

17.     Enacted in the 1973-74 oil embargo's aftermath, Congress created the Federal Energy Administration ("FEA") "to deal with the Nation's energy shortages." Federal Energy Administration Act of 1974, Pub. L. No. 93-275, § 2(c), 88 Stat 96, 97 (1974); 15 U.S.C. § 761 ("FEA Act").

18.     To achieve its underlying goals of conserving limited energy supplies, ensuring

their distribution, addressing consumer prices, and planning for future energy needs, the FEA Act

authorized FEA to "collect, evaluate, assemble, and analyze energy information on reserves,

production, demand, and related economic data[.]" Pub. L. No. 93-275, §§ 2(a), 5(b)(9); 15 U.S.C.

§§ 761(a), 764(b)(9).

19.     The FEA Act also required FEA to "promote free enterprise" and to "work with

business, labor, consumer and other interests and obtain their cooperation" when conducting

authorized activities. Pub. L. No. 93-275, §§ 5(b)(5), (10); 15 U.S.C. §§ 764(b)(5), (10).

20.     As relevant here, the FEA Act provided FEA with "information-gathering power,"

which requires "[a]ll persons owning or operating facilities or business premises who are engaged

in … major energy consumption" to make "information and periodic reports, records, documents,

and other data, relating to [the Federal Energy Administration Act's purposes]" available if such

information and data is "necessary or appropriate for the proper exercise of functions" under the

law and has been "prescribe[d] by regulation or order[.]" Pub. L. No. 93-275, § 13(b); 15 U.S.C.

§ 772(b).

21.     In 1976, Congress amended the FEA Act and established the Office of Energy

Information and Analysis. *See* Energy Conservation and Production Act, Pub. L. 94-385, § 52, 90

Stat. 1125, 1135-36; 15 U.S.C. § 790. That office was required to:

> (1) operate a comprehensive National Energy Information System, (2) possess
> expertise in energy analysis and forecasting, (3) be subject to performance
> audits by a Professional Audit Review Team, (4) coordinate energy information
> activities with Federal agencies, (5) promptly provide upon request any energy
> information to any duly established committee of Congress, and (6) make
> periodic reports on the energy situation and trends to the Congress and the
> public.

Energy   Info.   Admin.,   *Legislative   Timeline*   (last   visited   Feb.   22,   2024), https://www.eia.gov/about/legislative_timeline.php.

22.     A year later, Congress created the Department of Energy, and FEA's functions were transferred to and vested in the Secretary. *See* An Act to Establish a Department of Energy in the Executive Branch, Pub. L. 95-91, § 301, 91 Stat. 565, 577-78 (1977); 42 U.S.C. § 7151(a). The Department's originating statute also established the EIA and vested the Office of Energy Information and Analysis's functions with the EIA's Administrator, including the ability to gather energy information. Pub. L. 95-91, § 205; 42 U.S.C. § 7135.

23.     The EIA Administrator operates independently when collecting or analyzing energy information and preparing reports. Pub. L. 95-91, § 205(d); 42 U.S.C. § 7135(d).

24.     The FEA Act allows EIA to disclose information, including confidential information that it receives through information collections to other DOE components, to Congress, and to other federal agencies as authorized by law. *See*, *e.g.*, 15 U.S.C. §§ 773(b), 790h, 796(d).

25.     The FEA Act's information collections are enforced through criminal fines and civil penalties. 15 U.S.C. § 797; 10 C.F.R. § 207.7.

26.     Any person who violates Section 797(a) "shall be subject to a civil penalty of not more than $2,500 for each violation." 15 U.S.C. § 797(b). As adjusted for inflation, the civil penalty is currently as much as $12,937 for each violation. 10 C.F.R. § 207.7(c)(1).

27.     Any person who willfully violates Section 797(a) "shall be fined not more than $5,000 for each violation." 15 U.S.C. § 797(b); 10 C.F.R. § 207.7(b).

28.     DOE has interpreted Section 797(b)'s "each violation" provision to mean "[e]ach day that a violation … continues shall be deemed to constitute a separate violation" regarding both criminal fines and civil penalties. 10 C.F.R. § 207.7(a)(2).

### The Paperwork Reduction Act

29.     Enacted with overwhelming bipartisan support, the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501 *et seq.*, "was enacted in response to one of the less auspicious aspects of the enormous growth of our federal bureaucracy: its seemingly insatiable appetite for data. Outcries from small businesses, individuals, and state and local governments, that they were being buried under demands for paperwork, led Congress to institute controls." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990).

30.     The PRA's stated purposes include "7inimize[ing] the paperwork burden" imposed by the federal government, ensuring that the government's information collections and uses follow the Freedom of Information Act, 5 U.S.C. § 552, and protecting privacy and confidentiality under the Privacy Act, 5 U.S.C. § 552a. *See* 44 U.S.C. § 3501(a), (b).

31.     "Congress designated OMB the overseer of other agencies with respect to paperwork and set forth a comprehensive scheme designed to reduce the paperwork burden." *Dole*, 494 U.S. at 32; 44 U.S.C. § 3504. To that end, OMB has promulgated implementing regulations to guide each individual agency's information collections. 5 C.F.R. Ch. III, Subch. B, Pt. 1320.

32.     Agency heads are responsible for complying with the PRA and its implementing regulations. 44 U.S.C. § 3506(a)(1); 5 C.F.R. § 1320.7.

33.     The PRA and its implementing regulations set forth a comprehensive scheme for approving collections of information. 44 U.S.C. § 3507; 5 C.F.R. §§ 1320.9-13. Under that scheme, proposed collections are grouped into one of three categories: (1) collections that are not contained in proposed or current rules, 44 U.S.C. § 3507(c); 5 C.F.R. § 1320.10; (2) collections

contained in proposed rules, 44 U.S.C. § 3507(d); 5 C.F.R. § 1320.11; and (3) collections contained in existing rules, 44 U.S.C. § 3507(h)(2); 5 C.F.R. § 1320.12. The survey launched by EIA is in the first category.

34.     The procedure for each category varies, but they generally require public notice in the *Federal Register* and the opportunity for interested parties to comment before a collection is approved. *See* 5 C.F.R. §§ 1320.10-12.

35.     For example, under the standard clearance process, an agency must:

provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information, to solicit comment to—

(i) evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility;
(ii) evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information;
(iii) enhance the quality, utility, and clarity of the information to be collected; and
(iv) minimize the burden of the collection of information on those who are to respond, including through the use of automated collection techniques or other forms of information technology; …

44 U.S.C. § 3506(c)(2)(A). This notice-and-comment process must be completed *before* the agency seeks clearance from OMB. 44 U.S.C. § 3507(a).

36.     The PRA also permits an accelerated or "emergency" process. 44 U.S.C. § 3507(j); 5 C.F.R. § 1320.13. Under emergency processing, an agency may request authorization of a collection of information if its head determines that:

(A) a collection of information–
    (i) is needed prior to the expiration of time periods established under this subchapter; and
    (ii) is essential to the mission of the agency; and
(B) the agency cannot reasonably comply with the provisions of this subchapter because--

(i) public harm is reasonably likely to result if normal clearance procedures are followed;

(ii) an unanticipated event has occurred; or

(iii) the use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information or is reasonably likely to cause a statutory or court ordered deadline to be missed.

44 U.S.C. § 3507(j). The implementing regulations further require the agency to "state the time period within which OMB should approve or disapprove the collection of information[;]" "submit information indicating that it has taken all practicable steps to consult with interested agencies and members of the public in order to minimize the burden of the collection of information;" and comply with certain notice requirements, including publication in the *Federal Register*, unless waived. 5 C.F.R. § 1320.13. If a collection of information is approved by emergency processing, OMB assigns a control number which is valid for a maximum of 180 days after receipt of the agency submission. 44 U.S.C. § 3507(j)(2). However, the OMB implementing regulation permits only a shorter, 90-day period of validity.  5 C.F.R. § 1320.13(f) ("If OMB approves the collection of information, it shall assign a control number valid for a maximum of 90 days after receipt of the agency submission.").

37.     OMB assigns control numbers to approved collections. 44 U.S.C. § 3507(a)(3). Agencies are not permitted to "conduct or sponsor the collection of information" without following the required clearance process for the respective collection and receiving a control number. 44 U.S.C. § 3507(a).

38.     The PRA protects the public from unauthorized information collections by providing a limited defense to certain enforcement actions. 44 U.S.C. § 3512.

**FACTUAL ALLEGATIONS**

**Cryptocurrency and the Texas Cryptocurrency Mining Industry**

39.     Cryptocurrencies are digital currencies designed to be used over the internet. A distinguishing factor of cryptocurrencies is that they are decentralized. *See* Kate Ashford and Benjamin Curry, *What is Cryptocurrency?*, Forbes Advisor (updated Feb. 16, 2023, 10:52 am), https://www.forbes.com/advisor/investing/cryptocurrency/what-is-cryptocurrency/.  This  means that cryptocurrencies can be transferred online without the need for a middleman or trusted third party—such as a bank or clearing firm. This sets cryptocurrencies apart from traditional currencies—which are issued by a government or other central authority. *Id.*

40.     Bitcoin and Ethereum are the two most well-known cryptocurrencies. *Id.*

41.     To ensure that cryptocurrencies are secure, transactions are vetted and tracked by blockchain technology. *Id.* A blockchain is a public ledger—viewable by anyone with internet access. It is like a bank's balance sheet or ledger. Like any other ledger, the blockchain records transactions over time.

42.     Importantly, in addition to allowing cryptocurrency transactions to be recorded, blockchain technology also allows each and every transaction to be validated. *Id.* It is this validation mechanism that eliminates the need for a middleman or trusted third-party. Validation occurs through a consensus mechanism—in which a network of computers (each known as a node) reviews and validates the transaction. *Id.* Each cryptocurrency has its own blockchain. In the case of Bitcoin, the consensus mechanism is called "proof of work." *Id.*

43.    Companies known as "miners" are a critical part of a cryptocurrency's ecosystem. These miners provide computing power for calculating the valid hashes[1] for the consensus mechanism to secure the blockchain and the correct order of transactions. Simon Chandler and Richard Richtmyer, *Proof of work is at the core of the system that manages bitcoin transactions and secures the network*, Personal Finance (updated Nov. 22, 2022, 2:07 pm), https://www.businessinsider.com/personal-finance/proof-of-work.

44.    There are two primary ways in which miners ensure the integrity of the network: (1) a proof-of-work algorithm and (2) a proof-of-stake algorithm. A "proof-of-work" process is "[a] blockchain consensus mechanism [pioneered by Bitcoin] that requires a miner to solve a mathematical equation in order to be the first to add a new block to the chain" *Proof-of-work algorithm*, PCMag Encyclopedia (last visited Feb. 22, 2024), https://www.pcmag.com/encyclopedia/term/proof-of-work-algorithm. A "proof-of-stake" process is "[a] blockchain consensus mechanism that determines which miner can add transactions to the blockchain based on the amount of crypto the miner holds. The more crypto and the longer it is held (the more 'staked'), the greater the chance of adding the block." *Proof-of-stake algorithm*, PCMag Encyclopedia (last visited Feb. 22, 2024), https://www.pcmag.com/encyclopedia/term/proof-of-stake-algorithm.

45.    Miners use computers that produce trillions of hashes per second using application-specific integrated circuits ("ASIC") chips. Doing this requires specialized hardware and software—and as a result, the largest miners typically set up large data centers. *See* Coinbase, *What*

---

[1] "The hash is a 64-digit hexadecimal number that is the result of sending the information contained in a block through the SHA256 hashing algorithm." Jake Frankenfield, *What Is Bitcoin Mining?*, Investopedia (updated October 11, 2023), https://www.investopedia.com/terms/b/bitcoin-mining.asp.

*is mining?*, (last visited Feb. 22, 2024), https://www.coinbase.com/learn/crypto-basics/what-is-mining.

46.     Because of the time, expense, and regulatory approvals involved, it typically takes more than a year to set up one of these data centers and can take several years. For example, Riot recently announced the completion of the full build-out of the Whinstone Facility in Rockdale, Texas, where construction first began in 2019. Press Release, Riot, Riot Announces December 2023 Production and Operations Updates (Jan. 4, 2024), https://www.riotplatforms.com/riot-announces-december-2023-production-and-operations-updates/.

47.     Miners are compensated for their work by receiving new digital currency. *See supra* Coinbase, *What is mining?*.

48.     Like other data centers, these mining data centers use electricity. A unique attribute of mining is that its electrical loads are flexible. *See* LFL Analysis (Feb. 17, 2023), *archived at* https://texasblockchaincouncil.org/s/LFL_Analysis-1.pptx.  This flexibility sets miners apart from traditional data centers because they can power up or power down at a moment's notice. Rayan El Helou, Ali Menati, and Le Xie, *Physical and Economic Viability of Cryptocurrency Mining for Provision of Frequency Regulation: A Real-World Texas Case Study*, arXiv (2023) https://arxiv.org/abs/2303.09081; *see also* Nic Carter, et al., *Leveraging Bitcoin Miners as Flexible Load Resources for Power System Stability and Efficiency*, SSRN, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4634256.

49.     The Electric Reliability Council of Texas ("ERCOT")—which manages the Texas electrical grid and is responsible for ensuring its reliability—refers to industrial-scale cryptocurrency miners as "large flexible loads" ("LFL"). ERCOT, About ERCOT (last visited Feb. 22, 2024), https://www.ercot.com/about. ERCOT leverages these large flexible loads to stabilize

the grid. Through voluntary curtailment programs, ERCOT incentivizes cryptocurrency miners to take energy off the grid when supply exceeds demand and give energy back to the grid when demand exceeds supply. New Release, *ERCOT Creates Voluntary Curtailment Program for Large Flexible Customers During Peak Demand*, ERCOT (Dec. 6, 2022), https://www.ercot.com/news/release/2022-12-06-ercot-creates-voluntary. Most Texas-based miners, including TBC members, participate in ERCOT's voluntary curtailment programs, which have been critical in keeping the lights on for Texans during periods of high electrical demand.

50. For example, during 2022's Winter Storm Elliot, ERCOT reported that LFL consumption fell when prices—and demand—were at their peak. ERCOT. *See supra* LFL Analysis. ERCOT's analysis concluded that most LFLs "behaved in a manner which suggested they were responding to real-time prices" and that the remaining LFLs "curtailed their load for the entire duration of Elliot, independent of market prices." *Id.* at 4. The chart below shows this pattern:



*Id.* at 3.

51.     Miners have partnered with the Texas government in other areas as well. For instance, during Texas's last legislative session two mining-related bills were passed. The first, HB 591, provides incentives for mining data centers to utilize otherwise wasted gas to generate the electricity they use. Eliza Gkritsi, *Bitcoin Miners Gain Support From Texas With Two Bills Passed, One Halted*, CoinDesk (updated June 2, 2023, 11:50 a.m. EDT), https://www.coindesk.com/policy/2023/06/01/bitcoin-miners-gain-support-from-texas-with-two-bills-passed-one-halted/. The second, SB 1929, requires miners with energy capacity over 75 megawatts to register with ERCOT and share certain data with ERCOT. *Id.* Each of these bills was passed in partnership with the mining community and Plaintiff TBC.

52.     In short, Texas represents a success story in the mining industry and has become the leading state in the country for mining activity. Texas's cryptocurrency mining industry provides proof that mining can be done responsibly in a way that enhances electric grid stability.

53.     EIA's own data shows that ERCOT's system is rapidly moving towards renewable energy sources and reducing its reliance on coal generation. Energy Info. Admin., *Short-Term Energy Outlook* at 10 (February 2024), https://www.eia.gov/outlooks/steo/pdf/steo_full.pdf. ("We expect solar and wind power will grow the most in the portion of Texas that is part of the electric grid managed by the Electric Reliability Council of Texas (ERCOT). Forecast solar generation in ERCOT grows by 90% in 2024 (24 BkWh) and wind generation by 8% (9 BkWh)."); *id.* ("In 2024, we forecast coal generation in ERCOT to fall 23% (14 BkWh) as solar generation increases. Forecast natural gas generation falls in ERCOT by 4% (7 BkWh) this year with more renewable energy generation.").

54.     Some 25 TBC members engage in mining in Texas.

55.     The cryptocurrency mining industry is not without its detractors, and it has come under fire in recent years for its perceived harm to the environment, due primarily to "scope 2" emissions, which account for the fossil fuels used to create the electricity to power data centers.

56.     For example, in a September 2022 in a statement calling for collection of energy consumption information, the Biden White House suggested that it may "explore executive actions, and Congress might consider legislation, to limit or eliminate the use of high energy intensity consensus mechanisms for crypto-asset mining" to alleviate greenhouse gas emissions. White House, *FACT SHEET: Climate and Energy Implications of Crypto-Assets in the United States* (Sept. 8, 2022), https://www.whitehouse.gov/ostp/news-updates/2022/09/08/fact-sheet-climate-and-energy-implications-of-crypto-assets-in-the-united-states/.

57.     Likewise, several U.S. Senators and Members of Congress have suggested that cryptocurrency mining has "a major impact on climate change" and determined "that federal intervention is necessary[.]" Letter from Senator Elizabeth Warren, et al. to EPA Administrator Michael Regan at 3 (July 15, 2022), https://bit.ly/4bDHsia; *see also* Letter from Senator Elizabeth Warren, et al. to EPA Administrator Michael Regan at 3 (Feb. 6, 2023), https://bit.ly/3ONFQbT.

58.     Certain Senators and Members of Congress have also sought electricity usage by miners and other information directly from miners and ERCOT on the belief that the facilities contribute to climate change. Letters from Senator Elizabeth Warren, et al. to six mining companies at 1, 3-4 (Jan. 27, 2022), https://bit.ly/3UI5WAP. Letter from Senator Elizabeth Warren, et al. to Pablo Vegas at 1, 7-8 (Oct. 12, 2022), https://bit.ly/3UK656I; *see also* ERCOT Response Letter to Senator Warren, (Nov. 18, 2022), https://bit.ly/3T6joNI (responding that "ERCOT's interim large-load interconnection study policy requires all transmission utilities interconnecting new, large loads to submit interconnection studies demonstrating that the

transmission system is sufficient to serve these loads. Any issues identified in this process must be resolved prior to allowing energization of the load. ERCOT will not allow the interconnection of load that would be expected to result in any violation of reliability criteria.").

**EIA's Cryptocurrency Mining Facilities Report (EIA-862) Survey**

*EIA's January 24, 2024 Emergency Request*

59.     On January 24, 2024, Defendant DeCarolis submitted a request for emergency review and clearance of the Survey pursuant to 5 C.F.R. § 1320.13. Letter from Joseph F. DeCarolis to Dominic J. Mancini (Jan. 24, 2024) (attached as Exhibit 1).

60.     In the request, Defendant DeCarolis asserted that he had "determined that the information should be collected prior to the expiration of the time period established under [5 C.F.R. Part 1320]" and that he was making the request "because public harm is reasonably likely if normal clearance procedures are followed." *Id.*

61.     The assertion that "emergency" approval was necessary to prevent reasonably likely "public harm"—thereby allowing EIA to evade public notice and comment and other PRA safeguards—was facially absurd. To establish that public harm was reasonably likely to occur if normal clearance processes were followed Defendant DeCarolis stated:

a.     That the price of Bitcoin had risen recently which would incentivize more mining activity and lead to increased energy consumption. *Id.*

b.     That there had recently been a "major cold snap" in parts of the country that had resulted "in high electricity demand." *Id.*

c.     That "[t]he combined effects of increased cryptomining and stressed electricity systems create heightened uncertainty in electrical power markets[.]" *Id.*

16

d.     That such effects "*could* result in demand peaks that affect system operations and consumer prices" (citing to a single instance in New York more than five years ago). *Id.* (emphasis added).

e.     That "conditions can materialize and dissipate rapidly." *Id.*

f.     That EIA "*cannot quantitatively assess the likelihood of public harm*" but "*we feel a sense of urgency* to generate credible data that would provide insight into this unfolding issue." *Id.* (emphasis added).

62.     Of the reasons provided, only the 2018 instance in New York is cited to a publicly available source.

63.     The agency's purported justification does not withstand even minimal scrutiny because—as demonstrated by ERCOT's data—during a "cold snap," miners are some of the first electrical loads to be curtailed to ensure grid stability. *See supra* ¶¶ 48–50; *see also* Ben Strack, *Miners' bitcoin production dipped in January amid energy curtailment¸* Blockworks (Feb. 5, 2024, 1:30 PM), https://blockworks.co/news/bitcoin-mining-production-january.

64.     The survey's purported urgency also stands in stark contrast to Energy Secretary Granholm's April 26, 2023, testimony to the Senate Armed Services Committee. *See* Sen. Elizabeth Warren, *At Hearing, Warren Secures Commitment to Implement Mandatory Reporting of Cryptomining Energy Use*, YouTube (Apr. 26, 2023), https://www.youtube.com/watch?v=L0CsHdJwBSo.

65.     In response to Senator Elizabeth Warren's questions about cryptocurrency mining, DOE's authority to gather information from the industry, and when DOE could deploy a mandatory information collection, Secretary Granholm responded that the EIA survey would build on information gathered in an existing report that was scheduled to be completed by the end of

2023. *Id.* at 0:00-2:47. Indicating no sense of urgency, Secretary Granholm testified that it would then take additional time for EIA to craft a survey from that information. *Id.* at 2:00-2:46. She indicated that DOE was "pushing to accelerate the timeline." *Id.* at 3:18-4:17. She also verified that she hoped to deploy a mandatory survey "sometime in 2024" but stopped short of committing to a particular timeframe. *Id.* at 4:48-5:27. Secretary Granholm's response was cut off by Senator Warren saying "tick tock," followed by the Senator's claim that cryptocurrency mining "undermines our efforts to combat climate change," and that in the Senator's view the country is "out of time." *Id.* Senator Warren also expressed her hope that the next time Secretary Granholm was back to testify that she would be able to verify that mandatory cryptocurrency mining reporting was in place. *Id.* at 5:15-5:27.

66.     EIA's emergency request letter to OMB in January 2024 also stated that EIA had evaluated cryptocurrency mining activity through publicly available information, noted its rapid growth, and estimated that mining activity "currently represents as much as 2.2% of U.S. electricity consumption." Ex. 1 at 1.

67.     EIA's emergency request letter to OMB also alleged without evidence that mining companies are able to "relocate quickly to new areas with lower electricity prices" because the mining equipment they use is "modular" and that such capability "*could* further complicate the grid planning process." *Id.* (emphasis added).

68.     But, large-scale mining operations require long periods of time, great expense, and exhaustive regulatory processes to establish. *See supra* ¶ 46.

69.     The request letter further stated that EIA consulted with other federal agencies but was unable to identify "an authoritative data source of U.S. cryptocurrency mining energy consumption." Ex. 1 at 2.

70.     The request letter asserted that the data gathered by the survey during the emergency clearance period "will provide critical insight that informs [EIA's] approach for the regular clearance process." *Id.*

71.     The request letter relied on EIA's stated perception, in the face of contrary evidence, that cryptocurrency mining "potentially disrupted the electric power industry" to establish that "the time required to request data collection under normal clearance will exceed the need to urgently collect this information." *Id.*

72.     It also asserted that the "emergency survey is necessary for EIA to fulfill its mission to provide timely data collection to promote sound policymaking, efficient markets, and public understanding of energy and its current interaction with the economy and the environment." *Id.*

73.     The request noted that EIA determined that collection should be monthly and would be a "company-level form that reports for company facilities." *Id.* It also indicated that the Survey would go to eighty-two cryptocurrency mining companies. *Id.*

74.     EIA inexplicably estimated that at 26-pages the Survey would take miners only 0.5 hours to complete each month. *Id.*

75.     TBC members, including Riot, have already reported that the Survey will take multiple employees many hours at each company every month.

76.     EIA "plan[s] to publish the data" received in "the form of a series of articles on the EIA website" which "would be released in the latter half of 2024." *Id.*

77.     In closing, the EIA emergency request letter noted that "EIA is ready to deploy the Survey on January 29, 2024[.]" *Id.*

78.     The emergency review and clearance request were accompanied by several supporting documents:

    a.     Supporting Statement A (attached as Exhibit 2 to the Verified Complaint) included responses to a series of eighteen questions that purportedly demonstrated compliance with the requirements of the PRA and other applicable laws. *See also* General Services Admin., A guide to the Paperwork Reduction Act, Supporting Statements (last visited Feb. 22, 2024), https://pra.digital.gov/clearance-process/supporting-statement/.

    b.     Supporting Statement B (attached as Exhibit 3 to the Verified Complaint) includes responses about the nature of the survey, its respondents, the statistical methods to be used, how the agency will maximize responses, and information about how the survey is designed. *See also id.*

    c.     Draft form of "welcome" letter for the Survey (attached as Exhibit 4 to the Verified Complaint).

    d.     Draft form of "reminder" letter for the Survey (attached as Exhibit 5 to the Verified Complaint).

    e.     Draft form of "escalation" letter for the Survey (attached as Exhibit 6 to the Verified Complaint).

    f.     Draft form of the Survey (attached as Exhibit 7 to the Verified Complaint).

79.    Supporting Statement A mirrors much of the request letter's language with some notable differences or additions.

80.    Supporting Statement A appeared to change the rationale for the emergency request to the theory that "the rapid increase in cryptocurrency mining activity on the electrical grid *may* contribute to public harm during an unexpected event." Ex. 2 at 1 (emphasis added). But it cited no basis or evidence for this assertion.

81.     For the first time it singled out Bitcoin cryptomining as being different in kind than other cryptocurrency mining activities because this type of mining requires "proof of work" processes. *Id.*

82.     Supporting Statement A also confirmed that the emergency collection request was driven by forces outside of EIA. For example, it identified Executive Order 14067 as one consideration in seeking information. That Order stated that "[t]he United States has an interest in ensuring that digital asset technologies and the digital payments ecosystem are developed, designed, and implemented in a responsible manner that includes privacy and security in their architecture, integrates features and controls that defend against illicit exploitation, and *reduces negative climate impacts and environmental pollution, as may result from some cryptocurrency mining*." Exec. Order 14067, Ensuring Responsible Development of Digital Assets (Mar. 9, 2022) (emphasis added). The Statement also indicated that the request was driven by recommendations from various Senators, including Sen. Warren, and the White House Office of Science and Technology Policy, to "collect energy-relevant data on U.S. cryptomining activity." Ex. 2 at 3.

83.     The "emergency" appears to be a contrived political one. The Survey's emergency processing request seems to have been in response to political pressure, rather than any actual likely public harm. As noted above, EIA admitted as much when it said it could not quantitatively assess the likelihood of public harm. Rather, EIA simply "fe[lt] a sense of urgency"—all of a sudden. *See supra* ¶ 61.f. But the PRA's emergency processing is available only in limited circumstances—and political pressure is not one of them. *See* 5 C.F.R. § 1320.13.

84.     Supporting Statement A further indicated that EIA received concerns that cryptocurrency mining adds "strains to the electricity grid during periods of peak demand, the potential for higher electricity prices, as well as the effects on energy-related carbon dioxide ($CO_2$)

emissions." Ex. 2 at 3. As previously noted, any such concerns are contradicted by the available evidence. *See supra* ¶¶ 48–53.

85.     According to Supporting Statement A, some of the information "will be protected and not disclosed to the public to the extent that it satisfies the criteria for exemption under [certain privacy and trade secret laws]." *Id.* at 6. But the information "may also be made available, upon request, to another component of DOE; to any Committee of Congress; the Government Accountability Office; or other federal agencies authorized by law to receive such information." *Id.* at 6-7.

86.     Notably, the information received from the Survey can "be used for nonstatistical purposes such as administrative, regulatory, law enforcement,[2] or adjudicatory purposes." *Id.* at 7.

87.     There is no indication that EIA attempted to undertake any "steps to consult with … members of the public in order to minimize the burden of the collection of information" as required by 5 C.F.R. § 1320.13(c). This despite EIA having "identified a few commercial organizations and trade councils that provide information on the use of electricity by this sector." Ex. 2 at 5.

88.     On information and belief, none of the affected mining companies were contacted about the Survey or its emergency processing request until after the Survey was approved by OMB and EIA publicly announced the Survey.

89.     Prior to making its emergency request for OMB approval of the Survey, EIA failed to publish notice in the *Federal Register* as required by 5 C.F.R. § 1320.13(d); *see also* Ex. 2 at 6

---

[2] The potential use of the information for undefined "law enforcement" purposes is particularly concerning—engendering images of a nationwide collection of sensitive information without a warrant, subpoena, or any of the attendant safeguards.

("This is an emergency survey request and there is currently no Federal Register Notice. A Federal Register Notice will be published subsequent to the ICR approval, if approved.").

90.     On information and belief, 5 C.F.R. § 1320.13(d)'s *Federal Register* notice requirement was not waived or modified as to EIA's request.

91.     The Survey is subject to the procedural requirements set forth in 44 U.S.C. § 350(c) and 5 C.F.R. § 1320.10 because the collection is a new collection of information that is not contained in a proposed or current rule. *See*, *e.g.*, Ex. 2 at 8 ("This is a new collection request.").

***OMB Approves EIA's January 24, 2024 Emergency Request***

92.     On January 26, 2024, OMB approved the EIA "emergency" Survey without change. *See* Office of Mgm't & Budget, Notice of Action (Jan. 26, 2024) (attached as Exhibit 8); *see also* Office of Mgm't & Budget, Information Collection Request (ICR) Package (Jan. 26, 2024) (attached as Exhibit 9).

93.     OMB's Notice of Action indicates that the emergency request was received by OMB on January 24, 2024. Ex. 8.

94.     It also confirms that the Survey is a new collection. *Id.*

95.     The Survey was assigned OMB Control Number 1905-0213 which expires on July 31, 2024. *Id.*

96.     The expiration date is 189 days after OMB received EIA's emergency request. Under OMB's regulations, however, a control number is valid only "for a maximum of 90 days after receipt of the agency submission." 5 C.F.R. § 1320.13(f). And the PRA authorizes an approved emergency collection only "for a maximum of 180 days after the date on which Director received the request to authorize such collection." 44 U.S.C. § 3507(j)(2).

97.     OMB Control No. 1905-0213's authorization exceeds OMB's regulatory authority by 99 days, and its statutory authority by 9 days.

*EIA Deploys the Survey*

98.     On January 31, 2024, having already received "emergency" approval from OMB several days earlier, EIA announced for the first time publicly that it was initiating the Survey. Press Release, *EIA to initiate collection of data regarding electricity use by U.S. cryptocurrency miners*, Energy Info. Admin. (Jan. 31, 2024), https://www.eia.gov/pressroom/releases/press550.php.

99.     The next day, EIA posted an "in-depth analysis" of the Survey. That analysis largely tracked the emergency request and its supporting documents with some notable exceptions—including new claims about the distinctions in energy use between proof-of-work cryptocurrencies like Bitcoin and proof-of-stake cryptocurrencies like Ethereum. Energy Info. Admin., *Tracking electricity consumption from U.S. cryptocurrency mining operations* (Feb. 1, 2024), https://www.eia.gov/todayinenergy/detail.php?id=61364. The analysis specifically cited concerns raised by lawmakers in a series of letters to Secretary Granholm, in which the legislators expressed a desire "to secure information that *could* better identify the effects of cryptocurrency mining on electricity and energy-related $CO_2$ emissions" and "the need for the development of a 'mandatory disclosure regime' regarding emissions and energy use by cryptocurrency miners." *Id.* (emphasis added)

100.     On information and belief, EIA began sending the Survey to the eighty-two miners it identified, including Riot and other TBC members, on or about February 1, 2024, via First Class Mail.

101.     It is unclear which eighty-two miners were sent a survey. It is also unclear how EIA singled those miners out.

102.    On information and belief, TBC's members, including Riot, began receiving the Survey on or about February 9, 2024—*nearly two weeks after the Survey was approved and only two weeks before the first required reporting date*, February 23, 2023.

103.    On information and belief, the notification letters are generic and the salutation lines read only "Dear Respondent." *But see* Exs. 4-6 (salutation lines suggesting the letters would be directed to particular companies).

104.    On information and belief, the notification letters state that the Survey response is mandatory and that responses are due February 23, 2024.

105.    On February 9, 2024, the EIA published notice inviting public comment on the Survey's extension. 89 Fed. Reg. 9140 (Feb. 9, 2024). The notice indicated that public comments are due by April 9, 2024. *Id.*

106.    For the most part, the Survey does not differ from the draft Survey that was submitted to OMB with its emergency collection request. *Compare* EIA-862 Cryptocurrency Mining Facilities Report (OMB No. 1905-0213) (attached as Exhibit 10) *with* Ex.7.

107.    However, there is at least one material difference between the draft survey submitted to OMB and the one subsequently sent to miners. In the Draft Survey, the "YOUR RESPONSE IS REQUIRED BY LAW" provision informs respondents that "[f]ailure to comply [with the survey] may result in criminal fines, civil penalties and other sanctions as provided by law" and then directs respondents to the "provision on sanctions … in the instructions." Ex. 7 at 1. But, on information and belief, there was no "provision on sanctions" in the draft Survey submitted to OMB. *Id.* at 1, 26.

108.    In comparison, the OMB-approved Survey includes a "SANCTIONS" section which informs respondents that

The timely submission of Form EIA-862 by those required to report is mandatory under 15 U.S.C. §772(b), as amended. Failure to respond may result in a civil penalty of not more than $12,937 each day for each violation. The government may bring a civil action to prohibit reporting violations which may result in a temporary restraining order or a preliminary or permanent injunction without bond. In such civil action, the court may also issue mandatory injunctions commanding any person to comply with these reporting requirements.

Ex. 10 at 26.

109.    It is not clear from the publicly available information when this language was added, how it was added, who added it, why it was added, and whether and when OMB approved it.

110.    Completing the Survey is mandatory for recipients, under threat of criminal fines and civil penalties. *See* Ex. 10.

111.    The Survey consists of four "schedules." Schedule 1 seeks identifying information for each company completing the Survey, a survey contact for the company, and the survey contact's supervisor information. Ex. 10 at 2.

112.    This contact information is "personally identifiable information" (PII) as defined in OMB Circular No. A-130. *See* Office of Mgm't & Budget, OMB Circular No. A-130 at 33, https://www.reginfo.gov/public/jsp/Utilities/a130revised.pdf ("'Personally identifiable information' means information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual.").

113.    But OMB's approval indicated that either EIA stated that there was no PII or OMB determined that there was no PII despite the content of the Survey. *See* Ex. 9 (Question: "Does this ICR request any personally identifiable information (see OMB Circular No. A-130 for an explanation of this term)? Please consult with your agency's privacy program when making this determination." Answer: "No").

114.    Schedule 1 also has questions regarding the cryptocurrency activities of each company surveyed. Ex. 10. This section makes clear that EIA is seeking information only from companies that engage in proof of work currencies, like Bitcoin. *Id.* at 3. If the company responds "NO" to whether the "company engage[s] in cryptocurrency mining that involves using proof-of-work (PoW) consensus mechanism to add and verify transaction on a blockchain network," it can proceed to Schedule 4, which is an open request for comments from the company without providing the information demanded by Schedule 2 [or Schedule 3?]. *Id.* at 3-4, 24-25.

115.    Schedule 2 demands information from the target companies for each of their cryptocurrency mining facilities. *Id.* at 4. The Survey defines "cryptocurrency mining facility" as "a facility that houses electronic equipment used for mining of cryptocurrency which involves a proof-of-work consensus mechanism to add and verify new transaction on a blockchain network." *Id.* It then demands information regarding the facility's electricity consumption, a percentage of electricity used for cryptocurrency mining (or an estimate of), the name of the facility's electric service provider, the company's energy supplies, and characteristics of the company's cryptocurrency mining equipment. *Id.* at 4-5.

116.    The cryptocurrency mining equipment characteristics sought by Schedule 2 comprises highly proprietary information including the number of mining units, the age of the units, their mining electric load, and the mining hash rate. *Id.* at 5. That information, taken together with the facility's electric consumption, could permit competitors in the U.S. and abroad to reverse engineer a company's mining operation.

117.    The Survey states that only the "Survey Contact," the "Survey Contact's Supervisor," and "Electricity Bill(s) (if provided)" are protected and not subject to disclosure under the Freedom of Information Act and the Trade Secrets Act. Ex. 10 at 26.

118.   The Survey explicitly states that "[a]ll other information reported on Form EIA-862 is public information and may be publicly released in company identifiable form." *Id.* The "other information" includes the highly proprietary information described above, as well as the identity of company's energy suppliers. *Id.* at 4-5.

**Defendants Are Inflicting Here-and-Now Harm on TBC's Members**

119.   As described below, TBC's members, including Riot, have suffered or will suffer the sort of harm that the PRA was enacted to prevent—namely, being required to comply, under threat of criminal fines and civil penalties, with intrusive and burdensome government demands for sensitive and proprietary information at substantial cost and distraction of personnel.

120.   TBC's members who received the Survey must provide their responses to it by February 23, 2024.

121.   Failure to respond by that date may result in "criminal fines, civil penalties and other sanctions as provided by law." Ex. 10 at 1. Responses are also subject to criminal prosecution under 18 U.S.C. § 1001. *Id.* ("Title 18 USC 1001 makes it a criminal offense for any person knowingly and willingly to make to any Agency or Department of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction." (emphasis omitted)).

122.   Thus, TBC's members must either complete the unlawful Survey, exposing themselves to irreversible public disclosure of valuable, confidential proprietary information, or run the risk of government enforcement and per-day criminal fines and civil penalties.

123.   TBC's members face a sufficiently imminent and credible threat of government enforcement if they do not respond to the Survey.

124.   Riot has estimated that it has already expended more than 40 employee hours attempting to respond to the initial Survey. That is eighty times the estimated burden of 0.5 hours that EIA estimated it would take to complete the Survey. *See* Ex. 10 at 1.

125.   On information and belief, TBC's other affected members will incur similar compliance costs and personnel distraction.

126.   Other identified commercial cryptocurrency miners have or will suffer the same harms as Plaintiffs.

     a.   EIA has identified eighty-two commercial cryptocurrency miners who are subject to the EIA-862 survey. Energy Info. Admin., Cryptocurrency Mining Facilities Report (last visited Feb. 22, 2024), https://www.eia.gov/survey/.

     b.   Per EIA, each of those miners is subject to per day criminal fines and civil penalties if they do not complete and return the survey. *See* Ex. 10 at 1, 26.

## CLAIMS FOR RELIEF

### First Claim: For Violation of the Paperwork Reduction Act

127.   Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

128.   The PRA, 44 U.S.C. § 3501 *et seq.*, sets forth a comprehensive scheme for government information collections with the goal of minimizing the paperwork burdens the government places on individuals and businesses.

129.   The PRA forbids agencies from conducting information collections without proper authorization from OMB in compliance with the PRA. Agencies like the Defendants are statutorily bound to follow the law. 44 U.S.C. § 3506(a)(1); 5 C.F.R. § 1320. OMB, the PRA's administrator, is likewise under a duty to ensure that the law is followed. 44 U.S.C. §§ 3503, 3504.

130.   Defendants have failed to meet these obligations and violated the PRA for at least the following reasons:

a.  EIA did not plausibly establish a bona fide emergency or that "public harm was reasonably likely" to occur. EIA's seeking an emergency request and OMB's granting it on mere speculation and conjecture circumvented the PRA's required processes and was unlawful.

b.  OMB authorized the emergency collection for 189 days after the request was received, when the PRA authorizes a maximum of 180 days after receipt. Despite this obvious error, EIA still deployed the Survey.

c.  Similarly, OMB violated its own regulation by authorizing the emergency collection for 189 days after the request was received when 5 C.F.R. § 1320.13(f) authorizes OMB to approve an emergency processing request for only 90 days after receipt. Despite this obvious error, EIA still deployed the Survey.

d.  EIA violated 5 C.F.R. § 1320.13(c) by not undertaking any steps to consult with members of the public before seeking emergency processing. Relatedly, OMB violated 5 C.F.R. § 1320.13(c) by approving the emergency collection despite EIA having not engaged in the required public consultation.

e.  EIA further violated 5 C.F.R. § 1320.13(d) by not providing the required public notice before seeking OMB approval of its emergency request. Relatedly, OMB violated that regulation by approving the emergency collection without such public notice being provided.

131.  A declaration that Defendants violated the PRA will redress the harms suffered by Riot and TBC's members because it will establish that the Survey is unlawful and miners need not submit responses to it.

132.    Enjoining Defendants' emergency approval and information collection request, and requiring notice-and-comment in accordance with the PRA and its implementing regulations, will redress the harm suffered by TBC and its members.

**Second Claim: For Violation of the Administrative Procedure Act**

133.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

134.    The Administrative Procedure Act ("APA") provides that courts "shall" hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or without observance of procedure required by law." 5 U.S.C. § 706(2).

135.    Accordingly, the emergency request and approval of the Survey should be held unlawful and set aside for the following reasons:

a.    OMB acted arbitrarily or capriciously by approving EIA's emergency collection request, which did not meet the standards established under the PRA and its implementing regulations.

b.    OMB abused its discretion by approving EIA's emergency collection request, which did not meet the standards established under the PRA and its implementing regulations.

c.    Administrator DeCarolis and EIA acted in excess of statutory authority by seeking sensitive proprietary information that goes beyond the "energy consumption" information they are permitted to request under 15 U.S.C. § 772(b).

d.    Administrator DeCarolis acted arbitrarily or capriciously by determining that the Survey information collection was "needed" before the time periods prescribed by the PRA

and its implementing regulations, and that EIA could not comply with the standard clearance process because "public harm was reasonably likely" to occur.

e. Administrator DeCarolis abused his discretion by determining that the Survey information collection was "needed" before the time periods prescribed by the PRA and its implementing regulations, and that EIA could not comply with the standard clearance process because "public harm was reasonably likely" to occur.

f. Administrator DeCarolis acted contrary to law when he, or EIA at his direction, did not take steps to consult with members of the public before seeking emergency processing, 5 C.F.R. § 1320.13(d), and failed to provide the public notice required by 5 C.F.R. § 1320.13(d).

g. OMB acted in excess of statutory authority when it approved a 189-day emergency authorization for the Survey pursuant to 44 U.S.C. § 3507(j)(2). Section 3508(j)(2) allows such collections for a maximum 180 days and the agency was without statutory authority to grant the collection for a period in excess of that.

h. OMB acted contrary to law when it violated its own regulation, 5 C.F.R. § 1320.13(f), which limits its authority to grant an emergency collection to a maximum of 90 days and instead granted an emergency collection request for 189 days.

136. Enjoining Defendants' emergency approval and information collection request, and requiring notice-and-comment in accordance with the PRA and its implementing regulations will redress the harm suffered by Riot and other TBC members.

137. Ordering Defendants to destroy any Survey data received from any identified commercial cryptocurrency miners, including TBC members, will redress the harm of having been subjected to an unlawful collection of information.

## Third Claim: For Declaratory Judgment

138.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

139.    28 U.S.C. § 2201(a) provides in a case of actual controversy within its jurisdiction, "any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment and shall be reviewable as such."

140.    The Defendants are legally required to comply with the PRA and the APA but did not do so here.

141.    The rushed and unlawful approval of the Survey puts TBC's members at risk of criminal fines and civil penalties and subjects them to excessive compliance costs and distraction of their personnel as well as putting them at risk of public exposure of proprietary and confidential information.

142.    A declaration that Defendants violated the PRA and APA will redress the harms suffered by Riot and other TBC members due to the unlawfully authorized Survey. It will also put other potential respondents on notice that they do not need to complete the unlawful survey.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

a.  A temporary restraining order and/or preliminary injunction prohibiting Defendants Department of Energy and Energy Information Administration from collecting EIA-862 data from identified commercial cryptocurrency miners.

b.  Vacatur of OMB's emergency approval of the Cryptocurrency Mining Facilities Report Survey.

c.  A permanent injunction requiring Defendants Department of Energy and Energy Information Administration to sequester and destroy all Survey data received from any identified commercial cryptocurrency miners.

d.  A permanent injunction prohibiting Defendants from seeking, approving, or issuing an information collection request from identified commercial cryptocurrency miners without notice-and-comment as required by the Paperwork Reduction Act.

e.  A permanent injunction requiring Defendants to notify identified commercial cryptocurrency miners who were sent the Survey and provide them with a copy of such decisions, memoranda, or order(s) as this Court may issue.

f.  A declaration that Defendants violated the Paperwork Reduction Act and the Administrative Procedure Act.

g.  An award for all reasonable attorneys' fees and costs incurred herein and that Plaintiffs may be entitled to under law.

h.  Such other relief as this Court deems just and proper.

Dated this 22nd day of February 2024.

Respectfully,

/s/ Mark D. Siegmund

Kara M. Rollins*                    Chris Davis                      Mark D. Siegmund
Russell G. Ryan*                    Joshua Smeltzer                  State Bar Number 24117055
NEW CIVIL LIBERTIES ALLIANCE        GRAY REED                        CHERRY JOHNSON SIEGMUND
1225 19th St. NW, Suite 450         1601 Elm St., Suite 4600         JAMES PLLC
Washington, DC 20036                Dallas, TX 75201                 The Roosevelt Tower
Tel: (202) 869-5210                 Tel: (469) 320-6215              400 Austin Avenue, 9th Floor
Fax: (202) 869-5238                 Fax: (469) 320-6926              Waco, Texas 76701
kara.rollins@ncla.legal             cdavis@grayreed.com             Tel: (254) 732-2242
russ.ryan@ncla.legal                jsmeltzer@grayreed.com          Fax: (866) 627-3509
*Pro Hac Vice Motions                                               msiegmund@cjsjlaw.com
Forthcoming
                                    Greg White
                                    900 Washington Avenue
                                    Suite 800
                                    Waco, Texas 76701
                                    Tel: (254) 342-3003
                                    Fax: (469) 320-6926

*Counsel for Plaintiffs*

## VERIFICATION

I, Lee Bratcher, am a Board Member and the President of Plaintiff Texas Blockchain Council. On behalf of Texas Blockchain Council, I have read this Complaint and verify that the facts asserted are true and correct to the best of my knowledge, information, and belief, this 22nd day of February 2024.

Lee Bratcher,
Board Member and President of Plaintiff Texas Blockchain Council

## VERIFICATION

I, Alexander K. Travis, am Senior Vice President and Deputy General Counsel of Plaintiff, Riot Platforms, Inc., a Nevada corporation. On behalf of Riot Platforms, Inc., I have read this Complaint and verify that the facts asserted are true and correct to the best of my knowledge, information, and belief, this 22nd day of February 2024.

Alexander K. Travis,
SVP & Deputy General Counsel
Riot Platforms, Inc.