**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| TEXAS BLOCKCHAIN COUNCIL, a nonprofit association; RIOT PLATFORMS, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> DEPARTMENT OF ENERGY; JENNIFER M. GRANHOLM, in her official capacity as Secretary of Energy; ENERGY INFORMATION ADMINISTRATION; JOSEPH DECAROLIS, in his official capacity as Administrator of Energy Information Administration; OFFICE OF MANAGEMENT AND BUDGET; SHALANDA YOUNG, in her official capacity as Director of Office of Management and Budget, <br><br> *Defendants.* | Civil Action No. 6:24-cv-99 <br><br> **ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

Kara M. Rollins*
Russell G. Ryan*
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Tel: (202) 869-5210
Fax: (202) 869-5238
kara.rollins@ncla.legal
russ.ryan@ncla.legal
*Pro Hac Vice* Motions
Forthcoming

Chris Davis
Joshua Smeltzer
GRAY REED
1601 Elm St., Suite 4600
Dallas, TX 75201
Tel: (469) 320-6215
Fax: (469) 320-6926
cdavis@grayreed.com
jsmeltzer@grayreed.com

Greg White
900 Washington Avenue
Suite 800
Waco, Texas 76701
Tel: (254) 342-3003
Fax: (469) 320-6926

Mark D. Siegmund
State Bar Number 24117055
CHERRY JOHNSON SIEGMUND
JAMES PLLC
The Roosevelt Tower
400 Austin Avenue, 9th Floor
Waco, Texas 76701
Tel: (254) 732-2242
Fax: (866) 627-3509
msiegmund@cjsjlaw.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

MOTION FOR TEMPORARY RESTRAINING ORDER ................................................1

CERTIFICATE OF REASONABLE EFFORTS TO GIVE NOTICE OF TRO ..........................1

STATEMENT OF LEGAL POINTS AND AUTHORITIES .......................................................1

STATEMENT OF FACTS ...................................................................................................2

ARGUMENT .....................................................................................................................4

    I.  TRO STANDARD ................................................................................................4

    II.  PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS ............................5

        A.  Defendants Failed to Show that Public Harm Was Reasonably Likely to Occur Unless the Survey Was Authorized ...............................................................5

        B.  The Survey Is Unlawful Because OMB Exceeded Its Statutory Authority .................8

        C.  Defendants Failed to Follow the PRA's Implementing Regulations ...........................9

    III.  PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM WITHOUT IMMEDIATE RELIEF FROM THIS COURT .........................................................11

        A.  Nonrecoverable Compliance Costs Are Irreparable Harm .......................................12

        B.  Credible Threat of Prosecution Is Irreparable Harm .................................................13

        C.  The Disclosure of Proprietary Information Is Not Recoverable ...............................14

    IV.  THE BALANCE OF HARMS AND PUBLIC INTEREST FAVORS PLAINTIFFS ............................14

    V.  THE TEMPORARY RESTRAINING ORDER NOTICE REQUIREMENT IS SATISFIED .................15

    VI.  RULE 65(c)'S SECURITY REQUIREMENT SHOULD BE WAIVED ..........................................16

CONCLUSION ....................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
   141 S. Ct. 2485 (2021) ...................................................................................................15

*Am. Stewards of Liberty v. Dep't of the Interior*,
   370 F. Supp. 3d 711 (W.D. Tex. 2019) ......................................................................8, 9, 11

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 (2019) ...................................................................................................10

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*,
   17 F.4th 604 (5th Cir. 2021) ...........................................................................................8

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*,
   636 F.2d 1084 (5th Cir. 1981) .......................................................................................16

*Clark v. Prichard*,
   812 F.2d 991 (5th Cir. 1987) ...........................................................................................5

*Ctr. for Biological Diversity v. EPA*,
   937 F.3d 533 (5th Cir. 2019) ...........................................................................................4

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
   710 F.3d 579 (5th Cir. 2013) .........................................................................................11

*Dole v. United Steelworkers of Am.*,
   494 U.S. 26 (1990).............................................................................................................2

*Kaepa, Inc. v. Achilles Corp.*,
   76 F.3d 624 (5th Cir. 1996) ...........................................................................................16

*Ladd v. Livingston*,
   777 F.3d 286 (5th Cir. 2015) ...........................................................................................5

*League of Women Voters of U.S. v. Newby*,
   F.3d 1 (D.C. Cir. 2016) ..................................................................................................15

*Louisiana v. Biden*,
   55 F.4th 1017 (5th Cir. 2022) .........................................................................11, 12, 15

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
   No. 4:23-CV-00830-O, 2023 WL 6613080 (N.D. Tex. Oct. 7, 2023)...........................12, 13

*Nat'l Ass'n of Home Builders v. Norton*,
   340 F.3d 835, 841 (9th Cir. 2003).................................................................................11

*NFIB v. OSHA*,
   595 U.S. 109 (2022)...........................................................................................................8

*Nken v. Holder*,
   556 U.S. 418 (2009)...........................................................................................................5

*NMB Singapore Ltd. v. United States*,
   28 C.I.T. 1252 (2004)........................................................................................................7

*OCA-Greater Houston v. Texas*,
   867 F.3d 604 (5th Cir. 2017) ...........................................................................................4

*Opulent Life Church v. City of Holly Springs, Miss.*,
   697 F.3d 279 (5th Cir. 2012) .....................................................................................13, 14

*Restaurant Law Center v. Dep't of Labor*,
   66 F.4th 593 (5th Cir. 2023) ..........................................................................................12

*Robinson v. Ardoin*,
   37 F.4th 208 (5th Cir. 2022) ..........................................................................................14

*State of Tex. v. Seatrain Int'l, S. A.*,
    518 F.2d 175 (5th Cir. 1975) ................................................................................5
*Texas Bankers Ass'n v. CFPB*,
    No. 7:23-CV-00144, 2023 WL 4872398 (S.D. Tex. July 31, 2023) ........................14
*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ...............................................................................15
*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ........................................................................11, 12
*Texas v. Equal Emp. Opportunity Comm'n*,
    933 F.3d 433 (5th Cir. 2019) ...............................................................................10
*Texas v. United States*,
    524 F. Supp. 3d 598 (S.D. Tex. 2021) ...............................................................4, 5
*Thompson v. Goetzmann*,
    337 F.3d 489 (5th Cir. 2003) .................................................................................8
*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954) ..............................................................................................9
*United States v. Elrawy*,
    448 F.3d 309 (5th Cir. 2006) .................................................................................7
*United States v. Herrmann*,
    75 M.J. 672 (A. Ct. Crim. App. 2016) ....................................................................7
*United States v. Valera-Elizondo*,
    761 F.2d 1020 (5th Cir. 1985) ...............................................................................7
*Wages & White Lion Invs., L.L.C. v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ..............................................................................12
*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .............................................................................11

**Statutes**
15 U.S.C. § 772(b) ......................................................................................................2
44 U.S.C. § 3506(a)(1) ...............................................................................................2
44 U.S.C. § 3506(c)(2)(A) ...........................................................................................2
44 U.S.C. § 3507(a)(1)(B) ...........................................................................................2
44 U.S.C. § 3507(j) .....................................................................................................2
44 U.S.C. § 3507(j)(1) .................................................................................................5
44 U.S.C. § 3507(j)(2) .................................................................................................8
5 U.S.C. § 706(2)(A) ...................................................................................................6
5 U.S.C. § 706(2)(C) ...................................................................................................8

**Regulations**
5 C.F.R. § 1320.13 ..............................................................................................2, 5, 9
5 C.F.R. § 1320.13(a) .............................................................................................5, 6
5 C.F.R. § 1320.13(c) ..................................................................................................9
5 C.F.R. § 1320.13(d) ................................................................................................10
5 C.F.R. § 1320.13(f) .................................................................................................11
5 C.F.R. § 1320.5(a)(1)(iv) ........................................................................................10
5 C.F.R. § 1320.7 ........................................................................................................2

**Rules**

Fed. R. Civ. 65(b) ...........................................................................................15
Fed. R. Civ. P. 65(c)........................................................................................16

## MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs Texas Blockchain Council ("TBC") and Riot Platforms, Inc. ("Riot") through their undersigned counsel, move under Federal Rule of Civil Procedure 65 for the following temporary restraining order against Defendants:

1. A temporary restraining order prohibiting Defendants Department of Energy ("DOE") and Energy Information Administration ("EIA") from requiring Plaintiffs, including TBC's memerbs, to respond to Cryptocurrency Mining Facilities Report Survey (EIA-862) (the "Survey"), from collecting such data, and sequestering any such data that Defendants have already received.

In support of this Motion, Plaintiffs rely on the accompanying Statement of Legal Points and Authorities, the attached Appendix ("Pls.' App."), and the Verified Complaint [Dkt. 1]. As Plaintiffs establish, they are entitled to immediate relief because (1) Plaintiffs are substantially likely to prevail on the merits, (2) Plaintiff Riot and Plaintiff TBC's other members are and will continue to suffer irreparable harm without immediate relief from this Court, (3) the balance of equities tips in favor of Plaintiffs because they are under threat of criminal and civil prosecution and have incurred substantial compliance costs, and (4) the public interest is served whenever federal laws are enforced.

Plaintiffs respectfully request that this Court issue an *ex parte* temporary restraining order given the sufficiently imminent threat of enforcement, including criminal fines and civil penalties. Plaintiffs also request an opportunity to be heard on this Motion as soon as the Court's schedule allows. A proposed order is attached.

**CERTIFICATE OF REASONABLE EFFORTS TO GIVE NOTICE OF TRO**

Under Federal Rule of Civil Procedure 65(b)(1)(B) and Local Rule 7.1, I certify that counsel gave Defendants notice of their intent to seek a temporary restraining order under Rule 65 by email to DOE's Assistant General Counsel for Litigation on February 22, 2024. In that email, Plaintiffs' counsel notified DOE counsel that the survey was unlawful and asked that the initial survey response date be delayed from February 23, 2024 to April 26, 2024. DOE counsel responded on February 22—but did not agree to extend the initial response deadline to April 26, or for any time at all. Plaintiffs are required—under threat of criminal and civil penalty—to unlawfully disclose their highly confidential and proprietary information to Defendants by February 23, 2024, and further notice should not be required.

Consequently, Plaintiffs complied with 65(b)(1)(B)'s requirement that Defendants be given notice of Plaintiffs' intent to seek a TRO.

*/s/ Mark D. Siegmund*
Mark D. Siegmund
State Bar Number 24117055

**STATEMENT OF LEGAL POINTS AND AUTHORITIES**

The oft-cited proverb that "nothing is certain but death and taxes" needs to be modified for the modern era because in our current administrative state, it seems, nothing is certain but death, taxes—and paperwork. Decades ago, Congress recognized the government's insatiable lust for information and the concomitant burdens it placed on citizens and businesses. To combat the government's crushing paperwork demands, Congress passed the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501 *et seq*. with overwhelming bipartisan support. But a statute can achieve its purposes only when the parties bound to comply with and administer it—federal agencies and the Office of Management and Budget ("OMB"), respectively—actually do so. Here, Defendants

1

DOE, EIA, OMB, and their respective agency heads all failed to fulfill their legal obligations, violating the PRA and exceeding their authority in the process.

All the Defendants failed in their basic obligations under the law and exceeded their authority in the process. This Court should therefore grant Plaintiffs' motion for a temporary restraining order to uphold the rule of law and to maintain the status quo pending further proceedings in this Court. Riot and TBC's other members should not have to expend resources to comply with or be forced to provide sensitive and propriety information to the EIA in response to its legally deficient information demands and accompanying threats of civil and criminal fines.

## STATEMENT OF FACTS

EIA has "information-gathering power" and is permitted to request information from businesses that are engaged in certain activities. 15 U.S.C. § 772(b); *see also* Dkt. 1, ¶¶ 17–28 (describing EIA's information collecting and enforcement powers). But before burdening private parties with an information collection, EIA must comply with the PRA. 44 U.S.C. § 3506(a)(1); 5 C.F.R. § 1320.7; *see also* Dkt. 1, ¶¶ 29–38 (describing the PRA's framework). The PRA provides a comprehensive scheme for submitting, reviewing, and approving collections of information. *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990). The process is overseen by OMB. *Id.* A core aspect of the PRA's scheme is public participation through agency outreach and notice-and-comment opportunities. *See, e.g.*, 44 U.S.C. § 3506(c)(2)(A); 44 U.S.C. § 3507(a)(1)(B). The standard clearance process usually requires at least one round of notice and comment, and consideration of the resulting input, before OMB can authorize a collection and assign it a control number. *Id.* The PRA also provides an emergency processing mechanism which permits agencies to request, and OMB to authorize, a collection for a limited time if certain conditions are met. 44 U.S.C. § 3507(j); 5 C.F.R. § 1320.13.

*Cryptocurrency and the Texas Cryptocurrency Mining Industry*

Cryptocurrencies are digital currencies designed to be used over the internet, whose transactions are vetted and tracked by blockchain technology. Dkt. 1, ¶¶ 39–41. Each transaction must be validated, and "miners" play a critical part in the cryptocurrency ecosystem by providing computing power to validate transactions. Dkt. 1, ¶¶ 42–43. They do this calculating the valid hashes[1] for the consensus mechanism to secure the blockchain and record transactions. Dkt. 1, ¶¶ 42–43. Miners ensure the integrity of the network through either a proof-of-work algorithm or a proof-of-stake algorithm. Dkt. 1, ¶ 44. To do this work, miners use powerful computers that have specialized hardware and software. Dkt. 1, ¶ 45. Because of the time, expense, and regulatory approvals involved, it typically takes more than a year to set up one of these data centers, and regularly takes several years. Dkt. 1, ¶ 46. Like other data centers, these mining data centers use electricity. A unique attribute of mining is that its electrical loads are highly flexible. Dkt. 1, ¶ 48. That is particularly true here in Texas where miners participate in voluntary curtailment programs with Electric Reliability Council of Texas ("ERCOT"), which enhances grid stability. Dkt. 1, ¶¶ 49–50, 52. But the industry is often criticized for its perceived harm to the environment, due primarily to "scope 2" emissions, which account for the fossil fuels used to create the electricity to power data centers. Dkt. 1, ¶ 45; *see also* ¶¶ 56–58, 65, 81; *but see* ¶ 53.

More than two dozen TBC members mine in Texas. Dkt. 1, ¶ 54.

*EIA's Cryptocurrency Mining Facilities Report (EIA-862) Survey*

On January 24, 2024, EIA submitted an emergency request to OMB for the Cryptocurrency Mining Facilities Report Survey (EIA-862) seeking authorization to collect information regarding

---

[1] "The hash is a 64-digit hexadecimal number that is the result of sending the information contained in a block through the SHA256 hashing algorithm." Jake Frankenfield, *What Is Bitcoin Mining?*, Investopedia (updated October 11, 2023), https://www.investopedia.com/terms/b/bitcoin-mining.asp.

certain cryptocurrency mining companies' operations, including those of Riot and other TBC members. Dkt. 1, ¶¶ 59–91 (describing EIA's emergency request); *see also* Pls.' App. Exs. 1–7 (EIA's emergency request and supporting documents). OMB approved the emergency request two days later and assigned it a control number that expires on July 31, 2024, 189 days after OMB received EIA's emergency request. Dkt. 1, ¶¶ 92–97; *see also* Pls.' App. Ex. 8 (OMB's Notice of Action); Pls.' App. Ex. 9 (OMB's full information collection request summary). After OMB approved the Survey, Pls.' App. Ex. 10, EIA began sending the Survey out to miners including Riot and other TBC members. Dkt. 1, ¶¶ 98–100. The Survey is mandatory and miners are required to respond to it by **Friday, February 23, 2024**, and each month thereafter. Failing to respond to the Survey may subject miners to criminal fines and civil penalties. Dkt. 1, ¶¶ 108, 110, 119.[2]

As described in more detail below, the emergency request and the Survey's authorization are legally deficient for several reasons, including: (1) EIA did not plausibly establish a bona fide emergency or that "public harm was reasonably likely" to occur if the Survey were initiated using the processes required by the PRA; (2) the collection was authorized for longer than permitted by the PRA and its implementing regulations; and, (3) EIA failed to consult with the public or provide required public notice and opportunity to comment.

## ARGUMENT

### I.   TRO STANDARD

Temporary restraining orders apply the same standard as preliminary injunctions. *Texas v. United States*, 524 F. Supp. 3d 598, 651 (S.D. Tex. 2021) (citing *Clark v. Prichard*, 812 F.3d 991,

---

[2] TBC's standing is "derivative" of its members' standing. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Several TBC members, including Riot, have received the mandatory Survey and are required to respond to it by February 23, 2024 and each month thereafter through July 2024. Dkt. 1, ¶¶ 73, 100–104. As demonstrated below, Riot and other TBC members are suffering irreparable harm due to the Defendants' unlawful actions that will be redressed by a favorable decision. They have standing to pursue this matter. *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019).

993 (5th Cir. 1987)). For either relief to issue, a moving party must show "(1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015). Each of the four prerequisite burdens must be met, and none have "fixed quantitative values." *Texas v. United States*, 524 F. Supp. 3d at 651. "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). However, the third and fourth factors—balancing of equities and considering the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## II.    PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS

In their rush to approve the Survey, Defendants repeatedly failed to follow the law and exceeded their authority. Any one of the legal failures Plaintiffs highlight below is sufficient to show that they have a substantial likelihood of succeeding on the merits. Taken together, they show a slapdash and legally deficient process from start to finish. Plaintiffs should not be forced to comply with the unlawful Survey, and a temporary restraining order is warranted.

### A.    Defendants Failed to Show that Public Harm Was Reasonably Likely to Occur Unless the Survey Was Authorized

The PRA and its implementing regulations provide an emergency processing mechanism that bypasses many of the procedures that are typically required when agencies request and OMB approves information collections. 44 U.S.C. § 3507(j)(1); 5 C.F.R. § 1320.13. Under the law, an emergency request is permitted only when the agency head makes certain determinations. 44 U.S.C. § 3507(j)(1); 5 C.F.R. § 1320.13(a). At issue here is EIA's determination that it "[could] not reasonably comply with the normal clearance procedures … because … [p]ublic harm is

reasonably likely to result if normal clearance procedures are followed[.]" 5 C.F.R. § 1320.13(a). But EIA did not plausibly establish a bona fide emergency nor that "public harm is reasonably likely" to occur. Instead, EIA relied on mere speculation and conjecture to support its determination. In effect EIA assumed the results of the survey it is conducting. Such a determination is "arbitrary, capricious, [or] an abuse of discretion" under the Administrative Procedure Act ("APA") and should be set aside. 5 U.S.C. § 706(2)(A).

EIA's determination that "emergency" approval was necessary to prevent reasonably likely "public harm"—thereby allowing EIA to evade public notice and comment and other PRA safeguards—was facially absurd. In its emergency request EIA stated that the price of Bitcoin had risen and more miners would be incentivized to act, leading to increased energy consumption. Dkt. 1, ¶ 61.a.; Pls.' App. Ex. 1 at 1. It then cited a recent "cold snap" in other parts of the country and a resulting "high electricity demand." Dkt. 1, ¶ 61.b.; Pls.' App. Ex. at 1. The emergency request asserted that the combination of mining activity and stressed systems was creating uncertainty. Dkt. 1, ¶ 61.c.; Pls.' App. Ex. at 1. It also cited to a single instance in New York five years ago where it attributed increased consumer prices for electricity to mining activity. Dkt. 1, ¶ 61.d.; Pls.' App. Ex. at 1. The emergency request stated that "conditions can materialize and dissipate rapidly." Dkt. 1, ¶ 61.e.; Pls.' App. Ex. at 1. Most notably, the emergency request admitted that EIA "*cannot quantitatively assess the likelihood of public harm*" but nonetheless declared an emergency based on a hunch: "*we feel a sense of urgency* to generate credible data that would provide insight into this unfolding issue." Dkt. X, ¶ 61.f.; Pls.' App. Ex. at 1 (emphasis added).

EIA's subjectively felt "sense of urgency" is not tethered to any actual public harm, which EIA admitted it "cannot quantitively assess[.]" Rather, EIA's sense of urgency appears to be driven

by outside interests, including political pressure. Dkt. 1, ¶¶ 56-58, 65, 82-83. But political pressure and unquantifiable "feelings" cannot provide a basis for establishing that "[p]ublic harm is reasonably likely" to occur. Were this so, an agency could at any time make demands of disfavored persons or entities—rendering the PRA and its protections meaningless. While DOE and EIA may feel the clock ticking on their ability to get a rule written this year, *see* Dkt. 1, ¶ 65, that does not mean that EIA met the PRA's emergency processing requirements.

"The appropriate starting point when interpreting any statute is its plain meaning." *United States v. Elrawy*, 448 F.3d 309, 315 (5th Cir. 2006). "'Likely' means 'having a better chance of existing or occurring than not.'" *United States v. Valera-Elizondo*, 761 F.2d 1020, 1025 n.7 (5th Cir. 1985) (quoting Webster's Third New International Dictionary 1310 (1976)); *see also NMB Singapore Ltd. v. United States*, 28 C.I.T. 1252 (2004), *aff'd*, 140 F. App'x 268 (Fed. Cir. 2005) ("[T]he term 'likely' means probable."). "[F]anciful, speculative, or remote possibilit[ies]" are not ones that are "likely" to occur. *United States v. Herrmann*, 75 M.J. 672, 675 (A. Ct. Crim. App. 2016), *aff'd*, 76 M.J. 304 (C.A.A.F. 2017). EIA did not establish that public harm was more likely to occur than not if it had followed normal clearance processes. Instead, EIA couched its determination in mere conjecture and speculation. Dkt. 1, ¶ 61.d.; Pls.' App. Ex. at 1 (certain effects "*could* result in demand peaks" (emphasis added)); Dkt. 1, ¶ 61.f.; Pls.' App. Ex. at 1 (admitting that EIA "*cannot quantitatively assess the likelihood of public harm*" (emphasis added)); Dkt. 1, ¶¶ 80; Pls.' App. Ex. at 1 ("[T]he rapid increase in cryptocurrency mining activity on the electrical grid *may* contribute to public harm during an unexpected event" (emphasis added)). That is woefully insufficient to justify "emergency" approval under PRA and circumventing the normal notice-and-comment process and deliberation required before burying

private industry with intrusive government paperwork demands. EIA violated the PRA through its feigned emergency claim, and OMB violated the PRA by rubber-stamping it. [3]

### B. The Survey Is Unlawful Because OMB Exceeded Its Statutory Authority

It is a fundamental feature of our tripartite system of government that "[a]dministrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022). In reviewing the validity of agency actions, it is necessary to determine whether Congress authorized the challenged action. Here that inquiry "must start with the actual words of the [PRA], for it is the words of the statute that set the metes and bounds of the authority granted by Congress." *Thompson v. Goetzmann*, 337 F.3d 489, 495 (5th Cir. 2003). The APA requires courts to "hold unlawful and set aside agency action … found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C). Thus, [a]gency action that disregards applicable law is arbitrary and capricious, and must be set aside." *Am. Stewards of Liberty v. Dep't of the Interior*, 370 F. Supp. 3d 711, 725 (W.D. Tex. 2019).

The PRA authorizes OMB to approve emergency collections only "for a maximum of 180 days after the date on which the Director received the request to authorize such collection." 44 U.S.C. § 3507(j)(2). Any OMB approval that continues for more than 180 days from when the emergency request was received is not authorized by law. EIA's emergency request was received by OMB on January 24, 2024. Dkt. 1, ¶ 93; Pls.' App. Ex. 8. The Survey's control number purports to expire on July 31, 2024. Dkt. 1, ¶ 95; Pls.' App. Ex. 8. The July 31 expiration date is 189 days

---

[3] In striking down OSHA's "emergency" vaccine mandate, the Fifth Circuit noted that the agency's "pretextual basis" for its action was one of the "hallmarks of unlawful agency actions." *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 614 (5th Cir. 2021). The pretextual bases for the "emergency" here—bitcoin prices, a cold front, and a 2018 temporary event in New York—likewise reflect that the Survey is unlawful.

after OMB received EIA's emergency request. Thus, OMB exceeded its statutory authority by approving the Survey. Because OMB exceeded its authority, the Survey is not authorized under the PRA and EIA cannot lawfully require Riot or TBC's other members to provide responses to it.

### C. Defendants Failed to Follow the PRA's Implementing Regulations

Congressional authorization sets the outer bounds of an agency's authority. But agencies can, and do, place further restrictions on themselves through regulation. "Agency regulations are an extension of the legislative process and bind the agency with the force and effect of law.  As with statutes, an agency must comply with its own regulations, and the court must review an agency's actions to ensure conformity with relevant regulations." *Am. Stewards of Liberty*, 370 F. Supp. 3d at 725 (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-68 (1954) and collecting cases).

OMB has promulgated regulations implementing the PRA. *See generally* 5 C.F.R. Part 1320. Among those is OMB's emergency processing regulation, under which the Survey was approved. 5 C.F.R. § 1320.13. That regulation requires, among other things, that "[t]he agency shall submit information indicating that it has taken all practicable steps to consult with interested agencies and members of the public in order to minimize the burden of the collection of information." 5 C.F.R. § 1320.13(c). EIA made no such showing. In fact, despite having "identified a few commercial organizations and trade councils that provide information on the use of electricity by this sector," Riot and other members of the TBC were not contacted about the Survey or its emergency processing request until *after* the Survey was already approved by OMB. Dkt. 1, ¶ 87–88; Pls.' App. Ex. 2 at 5. OMB should have rejected EIA's emergency request because it did not comply with 5 C.F.R. § 1320.13(c).

OMB's emergency processing regulation also requires an agency to provide specific *advance* notice in the *Federal Register* in the form of "a statement that it is requesting emergency processing, and the time period [within which OMB should approve or disapprove the request]." 5 C.F.R. § 1320.13(d). This notice provision provides the public an important opportunity to provide comments to OMB about the proposed emergency collection. *See* 5 C.F.R. § 1320.5(a)(1)(iv); 5 C.F.R. § 1320.13(d). EIA admittedly did not publish the required notice in the *Federal Register* prior to making its emergency request. Dkt. 1, ¶ 89 Pls.' App. Ex. 2 at 6 ("This is an emergency survey request and there is currently no Federal Register Notice. A Federal Register Notice will be published subsequent to the ICR approval, if approved."). There is nothing in the public record suggesting that the notice requirement was waived. Dkt. 1, ¶ 90. OMB should have rejected EIA's emergency request because it did not comply with 5 C.F.R. § 1320.13(d).

EIA's failure to provide 5 C.F.R. § 1320.13(d)'s required notice and comment is problematic for another reason: the PRA provides Plaintiffs with a procedural right to notice and the opportunity to comment. *Cf. Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019) ("A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right."). Just as a violation of the APA's notice-and-comment requirements deprives a party of its procedural right, EIA's violation of the PRA's notice-and-comment requirements deprived Plaintiffs of their procedural rights. Failing to provide the required notice and comment also deprived EIA of valuable information. "Notice and comment gives affected parties fair warning of [agency actions] and an opportunity to be heard on those [actions]—and it affords the agency a chance to avoid errors and make a more informed decision." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019) (discussing APA's notice-and-comment procedures). In their inexplicable haste to get the Survey approved and deployed, Defendants

deprived themselves of public and industry input and likely made the Survey more burdensome and less useful than it could have been.

Finally, OMB violated its emergency processing regulation because it approved the Survey for longer than permitted. Under 5 C.F.R. § 1320.13(f), when OMB approves an information collection and assigns it a control number, the control number is "valid for a maximum of 90 days after receipt of the agency submission." But as already noted, the Survey's control number is ostensibly valid until July 31, 2024—189 days after OMB received EIA's emergency request. In approving the survey, OMB did not comply with 5 C.F.R. § 1320.13(f).

OMB chose to promulgate its emergency processing regulation and, having done so, OMB was bound to follow it—and verify that EIA had followed the regulation before approving its emergency request. *Am. Stewards of Liberty*, 370 F. Supp. 3d at 726 (citing *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003)). But OMB failed to follow its regulation in multiple respects. As a result, the Survey is not lawfully authorized under the PRA, and EIA cannot lawfully require Riot, nor TBC's other members, to provide responses to it.

## III. PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM WITHOUT IMMEDIATE RELIEF FROM THIS COURT

"A showing of irreparable harm requires a demonstration of 'harm for which there is no adequate remedy at law.'" *Louisiana v. Biden*, 55 F.4th 1017, 1033–34 (5th Cir. 2022) (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)). And "[e]ven purely economic costs may count as irreparable harm "where they cannot be recovered 'in the ordinary course of litigation.'" *Texas v. EPA*, 829 F.3d 405, 434 & n.41 (5th Cir. 2016) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). When the defendant is the government, "costs are not recoverable because the government-defendant enjoys sovereign immunity from monetary damages, [and] irreparable harm is generally satisfied." *Nat'l Ass'n for*

11

*Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2023 WL 6613080, at *16 (N.D. Tex. Oct. 7, 2023) (citing *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021)). Plaintiffs have met this standard.

### A. Nonrecoverable Compliance Costs Are Irreparable Harm

The Fifth Circuit has recognized that "the nonrecoverable costs of complying with a putatively invalid [agency action] typically constitute irreparable harm." *Restaurant Law Center v. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023); *see also Louisiana v. Biden*, 55 F.4th at 1034 ("'[C]omplying with [an agency action] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs[.]'" (quoting *Texas v. EPA*, 829 F.3d at 433). Such compliance costs need to "be based on more than 'speculat[ion]' or 'unfounded fears.'" *Id.* (quoting *Louisiana v. Biden*, 55 F.4th at 1034). The core of the irreparable costs' inquiry "is 'not so much the magnitude but the irreparability.'" *Id.* (quoting *Texas v. EPA*, 829 F.3d at 433–34). Compliance costs do not have be converted "into a specific dollar amount." *Id.* at 600. The alleged costs must only "constitute 'more than *de minimis*' harm[.]" *Id.* (quoting *Louisiana v. Biden*, 55 F.4th at 1035).

Riot has already incurred nonrecoverable costs to comply with and respond to the Survey. *See* Dkt. 1 ¶¶ 73, 119, 125; *see also Restaurant Law Center*, 66 F.4th at 600. Riot estimates that its employees have collectively spent at least 40 hours attempting to respond to the initial Survey. Dkt. 1 ¶ 124. Notably, that is *80 times more* than the Survey's estimated burden of 0.5 hours and nearly a sixth of the aggregate estimated burden for all miners over the six-month emergency collection. *See* Pls.' App. Ex. 10 at 1; *see also* Ex. 2 at 7 (discussing hour burden and how that was calculated); *see also Restaurant Law Center*, 66 F.4th at 598 (noting that uncontested evidence of member businesses' time burdens "project[ed] … ongoing management costs" that exceed

agency's "rosy" estimated burden).[4] Likewise, TBC has heard from its affected members that the Survey is taking multiple employees many hours to complete. Dkt. 1 ¶ 125. For each Riot or other TBC member employee dedicating time to completing the Survey, instead of performing their actual job functions, the companies suffer nonrecoverable harm, as there is no way to recover compliance costs from the United States government. This irreparable harm is ongoing and will continue to occur unless the Defendants are restrained from collecting the Survey information.

### B.  Credible Threat of Prosecution Is Irreparable Harm

Riot and TBC's other members "place themselves in potential jeopardy by bringing this challenge" to the Survey. *Cf. Nat'l Ass'n for Gun Rts., Inc.,* 2023 WL 6613080, at *16. The Survey is mandatory, Dkt. 1 ¶¶ 104, 108, 110, and Riot and other affected TBC miners are presented with a Hobson's choice: complete an unlawful information collection authorized in excess of Defendants' statutory authority or risk substantial daily criminal fines and civil penalties, Dkt. 1 ¶¶ 25–28, 110, 119–122. The deprivation of statutory rights—here, among other things, the right to be free from collections of information in excess of authority under the law—is an irreparable injury. *Nat'l Ass'n for Gun Rts., Inc.*, 2023 WL 6613080, at *17 (citing *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012)).

As the Survey makes clear, compliance is mandatory, and Riot and the other affected TBC members *must* complete the Survey and provide their responses to EIA no later than Friday, February 23, 2024, and monthly thereafter for an additional five months. Dkt. 1 ¶¶ 73, 102, 104, 108, 110. This requirement causes an immediate, irreparable, and ongoing harm. Defendants should be restrained from collecting the Survey information.

---

[4] If Defendants had chosen not to circumvent that statute and regulations, they would have known that the estimated burden was completely divorced from reality. And they could have worked with parties like the Plaintiffs to ensure that the survey was modified accordingly. This is exactly what the PRA and its protections are intended for.

### C.  The Disclosure of Proprietary Information Is Not Recoverable

One of the more troubling aspects of the Survey is that it seeks sensitive and highly proprietary information. Dkt. 1 ¶ 115–116. That information, taken together with the facility's electrical consumption, could permit competitors in the U.S. and abroad to reverse engineer a company's mining operation. *Id.* There are also few restrictions on EIA's sharing that information for "nonstatistical purposes" including law enforcement purposes. Dkt. 1 ¶ 86, n.2. Likewise, EIA has said that the information may also be made available to "any Committee of Congress" or other federal agencies. Dkt. 1 ¶ 85. Given that the "emergency" appears to be a contrived political one, *see* Dkt. 1 ¶ 56–58, 64–65, 83, being forced to provide such sensitive and highly proprietary information—under threat of prosecution, with no guarantees that it will be protected—is alarming. And the potential for economic loss is untold and not recoverable. Defendants should be restrained from collecting the Survey information. To the extent they have already received responses, they should be required to sequester such responses from disclosure.

### IV.  THE BALANCE OF HARMS AND PUBLIC INTEREST FAVORS PLAINTIFFS

The balance of harms favors Plaintiffs. "The equities favor a stay if it would benefit the [movant] more than it would harm the nonmovants." *Robinson v. Ardoin*, 37 F.4th 208, 228 (5th Cir. 2022). And "[o]nce a court has 'concluded that [the movant's] harm is irreparable ... [the nonmovant] would need to present powerful evidence of harm to its interests to prevent [the movant] from meeting this requirement.'" *Texas Bankers Ass'n v. CFPB*, No. 7:23-CV-00144, 2023 WL 4872398, at *7 (S.D. Tex. July 31, 2023) (quoting *Opulent Life Church*, 697 F.3d at 297). The Government cannot meet this high threshold. Plaintiffs' harm is irreparable. They have incurred or will incur substantial compliance costs because of Defendants' actions, and they will significantly benefit from not being forced to divulge sensitive and proprietary information, *see* Dkt. 1, ¶¶ 85–86, 115–116, 119, in response to a legally deficient Survey under threat of

prosecution. On the other hand, if this Court issues the requested immediate and preliminary relief, the Defendants will suffer virtually no harm.

The final factor also favors Plaintiffs because there is considerable public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) (per curiam) (quotation omitted). That is because "'[t]here is generally no public interest in the perpetuation of unlawful agency action.'" *Id.* at 560 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also Louisiana v. Biden*, 55 F.4th at 1035 (same). As the Supreme Court has observed, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021). In their haste to get the Survey approved and deployed, Defendants ignored mandatory PRA processes and exceeded their statutory authority. The public interest is served by granting Plaintiffs' requested relief.

## V.    THE TEMPORARY RESTRAINING ORDER NOTICE REQUIREMENT IS SATISFIED

Plaintiffs have shown a right to relief under Rule 65(b). Rule 65(b) states that the "court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (a) specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (b) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should be required." *See* Fed. R. Civ. 65(b). Here, Plaintiffs' have satisfied both requirements. First, Plaintiffs have shown through their verified complaint, affidavit, and supporting documentation, as well as through this Motion, that they will suffer immediate and irreparable harm if the temporary restraining order is not issued before Defendants can be heard. Namely, Plaintiffs are required—under threat of criminal and civil penalty—to unlawfully disclose

their highly confidential and proprietary information to Defendants by February 23, 2024. Finally, Plaintiffs have certified in writing their efforts to give notice (which Plaintiffs did), and additionally why this notice was more than sufficient and further notice was not required given the imminent harm to Plaintiffs.[5]

## VI.    RULE 65(c)'S SECURITY REQUIREMENT SHOULD BE WAIVED

While Rule 65(c) provides that "[t]he court may issue … a temporary restraining order only if the movant gives security in an amount that the court considers proper," the amount required is a matter of a trial court's discretion and the court may order no bond at all. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). Trial courts can, and often do, waive the bond requirement when the case seeks to protect a litigant's right to prevent governmental encroachments. *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) ("[P]laintiffs were engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that the Court grant their motion for a temporary restraining order.

---

[5] Moreover, contemporaneously with this filing, Plaintiffs have also hand delivered a copy of Plaintiffs' Complaint and this Motion to the United States Attorney's Office for the Western District of Texas.

16

Dated this 22nd day of February 2024.

Respectfully,

/s/ Mark D. Siegmund

Kara M. Rollins*
Russell G. Ryan*
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Tel: (202) 869-5210
Fax: (202) 869-5238
kara.rollins@ncla.legal
russ.ryan@ncla.legal
*Pro Hac Vice Motions
Forthcoming

Chris Davis
Joshua Smeltzer
GRAY REED
1601 Elm St., Suite 4600
Dallas, TX 75201
Tel: (469) 320-6215
Fax: (469) 320-6926
cdavis@grayreed.com
jsmeltzer@grayreed.com

Greg White
900 Washington Avenue
Suite 800
Waco, Texas 76701
Tel: (254) 342-3003
Fax: (469) 320-6926

Mark D. Siegmund
State Bar Number 24117055
CHERRY JOHNSON SIEGMUND
JAMES PLLC
The Roosevelt Tower
400 Austin Avenue, 9th Floor
Waco, Texas 76701
Tel: (254) 732-2242
Fax: (866) 627-3509
msiegmund@cjsjlaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on February 22, 2024, a true and correct copy of the foregoing document was

transmitted using the CM/ECF system, which automatically sends notice and a copy of the filing

to all counsel of record. Hand service is being made to the United States Attorney's Office for the

Western District of Texas at:

U.S. Attorney's Office
903 San Jacinto Blvd., Suite 334
Austin, Texas 78701

/s/ Mark D. Siegmund
Mark D. Siegmund